IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHARON CARROLL TSERKIS,
Individually, and as Personal
Representative of the Estate of Jeffrey
Gene Evans, et. al.,

    *Plaintiffs*,

    v.

BALTIMORE COUNTY, et. al.,

    *Defendants*.

Civil Action No. ELH-19-202

## MEMORANDUM OPINION

This civil rights case arises from the fatal shooting of fifty-two-year-old Jeffrey Evans ("Evans" or "Decedent") on December 14, 2015, at the hands of Baltimore County police officers. They arrived at the home of Evans's girlfriend, Jennifer Wild, after she informed a 911 operator that Evans had consumed numerous pills of prescription painkillers and was acting suicidal. In the ensuing interaction between Evans and the officers, Evans was tased three times and then fatally shot.

Plaintiffs Sharon Carroll Tserkis, individually and as Personal Representative of the Estate of Evans; Jacqueline Williams; Valerie Jernigan; and Amanda Cooper-Spaulding, as "Mother, Guardian, and Next Friend" of K.E., a minor, filed suit in the Circuit Court for Baltimore County. ECF 1-4 (the "Complaint"). Tserkis, Williams, and Jernigan are sisters of the Decedent, and K.E. is the granddaughter of the Decedent. *Id.* ¶¶ 5, 6, 7, 8.[1] They sued Baltimore County (the "County") as well as Baltimore County Police Department ("BCPD") officers Michael

---

[1] Without explanation, both sides refer to Jernigan in their submissions as "Valerie Stutzman." *See, e.g.*, ECF 77-1 at 4, 16; ECF 85 at 14. Accordingly, I shall do the same.

Pfadenhauer, Chad Canup, Michael Spahn, Adam Heavner, and Michaela Moore (collectively, the "Officers" or "Officer Defendants"), alleging violations of federal and Maryland law.[2]  Defendants removed the case to federal court on the basis of federal question jurisdiction, pursuant to 28 U.S.C. § 1331.  ECF 1 ("Notice of Removal").

At its core, the suit is premised on the theory that, in tasing and then shooting Evans, the Officers used excessive force, which resulted in an unconstitutional seizure.  The Complaint contains eleven counts.  Counts I through V, along with Count XI, assert State law claims, as follows, ECF 1-4, ¶¶ 36-61, 119-125:

- Count I (all plaintiffs against all defendants) — "Wrongful Death," pursuant to Md. Code (2020 Repl. Vol.), § 3-904(a) of the Courts and Judicial Proceedings Article ("C.J.");

- Count II (Tserkis, in her representative capacity, against all defendants) — "Survival Action," pursuant to the Maryland "Survival Act Statute";[3]

- Count III (all plaintiffs against all defendants) — violation of the Decedent's rights under Article 24 of the Maryland Declaration of Rights "to be free from unreasonable seizures without due process of law, and . . . to be free from excessive force";

- Count IV (all plaintiffs against all defendants) — "Bystander Liability," in violation of Evans's right under an unspecified provision of the Maryland Constitution "to be free from an unreasonable seizure without due process of law";

- Count V (all plaintiffs against the Officers) — violation of Mr. Evans's rights under Article 24 of the Maryland Declaration of Rights "to be free from an unreasonable seizure without due process of law . . . .";

- Count XI (Tserkis, in her representative capacity, against the Officers) — "Battery."

Counts VI through X are founded on 42 U.S.C. § 1983, *id.* ¶¶ 62-118:

_____

[2] Plaintiffs seem to have sued the Officers in their official and individual capacities.  ECF 1-4, ¶¶ 11, 13, 15, 17.

[3] As discussed, *infra*, two statutes are relevant to the survivorship claims of a decedent: C.J. § 6-401 and Md. Code (2017 Repl. Vol., 2020 Supp.), § 7-401(y) of the Estates and Trusts Article.

- Count VI (Tserkis, in her representative capacity, against all defendants) — violation of Evans's rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution;

- Count VII (Tserkis, in her representative capacity, against the Officers) — "Peace Officer Liability," on the basis of a violation of Evans's rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution;

- Count VIII (Tserkis, in her representative capacity, against all defendants) — "Bystander Liability," in violation of the "right to be free from an unreasonable search and seizure without due process of law . . . ."

- Count IX (Tserkis, in her representative capacity, against all defendants) — "Municipal Liability," on the basis of an alleged pattern and practice of failure to train and supervise, pursuant to *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978);

- Count X (all plaintiffs against all defendants) — "Excessive Force in Violation of the Fourth and Fourteenth Amendments."

By Memorandum (ECF 21) and Order (ECF 22) of October 4, 2019, the Court bifurcated the *Monell* claim (Count IX). In addition, *Monell* discovery was stayed, pending resolution of the claims against the Officers.

The Officers have filed a post-discovery motion for summary judgment. ECF 77.[4] The motion is supported by a memorandum (ECF 77-1) (collectively, the "Motion") and numerous exhibits. ECF 77-3 to ECF 77-39. The Officers argue that they are entitled to qualified immunity,

---

[4] Summary judgment motions were due by February 22, 2020. *See* ECF 11; ECF 19; ECF 27. No motion was filed by that date. The Officers subsequently moved for leave to file a motion for summary judgment, out of time. ECF 45. By Memorandum (ECF 75) and Order (ECF 76) of January 19, 2021, I granted that motion.

As I explained in ECF 75, during the course of the litigation, the original defense attorney was diagnosed with metastatic cancer. And, at the time, the world was in the grip of the COVID-19 pandemic, which impacted the progress of the case. New defense attorneys entered the case in July and September 2020. *See* ECF 38; ECF 40.

In addition, I note that the BCPD has not joined the Officers' motion. Given the bifurcation of the *Monell* claim (Count IX), and the fact that the BCPD has not moved for summary judgment, in this Memorandum Opinion I shall not address the claims asserted against the BCPD.

and that all plaintiffs, other than Tserkis in her representative capacity, lack standing to sue under Maryland's wrongful death statute, C.J. § 3-904.  Plaintiffs oppose the motion.  ECF 83; ECF 85.  Their submissions are supported by exhibits.  The Officers replied.  ECF 87.

In addition, the Officers have moved to bifurcate the trial as to damages.  ECF 74 (the "Bifurcation Motion").  Plaintiffs oppose the Bifurcation Motion.  ECF 80.  The Officers replied.  ECF 82.

No hearing is necessary to resolve the pending motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the summary judgment motion in part and deny it in part.  And, I shall deny the Bifurcation Motion.

## I.  Factual Background[5]

### A.

The Officers are the only eyewitnesses to the tasing and shooting of Evans.  Their statements to the BCPD and their deposition testimony provide most of the facts.  However, plaintiffs submitted, among other things, a video that shows the critical portion of the incident at issue.[6]

---

[5] The facts are taken from the parties' exhibits, viewed in the light most favorable to plaintiffs as the nonmoving parties.

Many of the facts are drawn from statements made by the Officers to the BCPD, presumably for investigative purposes, in the wake of Evans's death.  For instance, the statement of Officer Moore (ECF 77-6, "Moore's Stmnt."), dated December 16, 2015—two days after the incident at issue—displays the letterhead of BCPD and the title "Confidential Report of Investigation."  *Id.* at 1.  I shall use the same nomenclature to refer to the other statements, *e.g.*, "Pfadenhauer's Stmnt. (ECF 77-7) and "Canup's Stmnt." (ECF 77-10).  Although the other statements do not appear on documents displaying the BCPD letterhead and are not clearly dated, there is no dispute concerning their authenticity or relevance.  Indeed, both sides submitted the statements as exhibits.  For convenience, I cite to the version of the exhibits submitted by the Officers.

The video appears to have been recorded by a camera in, or affixed to, Spahn's taser.  *See* ECF 77-11 (Spahn's Stmnt.) at 2.  Although the Officers submitted still images that apparently were extracted from the video (ECF 77-14 to ECF 77-34), they do not acknowledge the video footage, which is decidedly more revealing than the series of still photographs.

The Supreme Court has instructed that, when "'opposing parties tell two different stories, one of which is blatantly contradicted' by video evidence contained in the record . . . a court should "view[ ] the facts in the light depicted by the videotape,'" rather than rely on "'visible fiction' propounded by the party whose account is contradicted by the video evidence.  *Sawyer v. Asbury*, 537 F. App'x 283, 291 (4th Cir. 2013) (quoting *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)), *abrogated in part on other grounds, as recognized in Brooks v. Johnson*, 924 F.3d 104, 114 n.4 (4th Cir. 2019).  On the other hand, "the principle articulated in *Scott* does not license a court to reject one side's account as a matter of law if the 'documentary evidence, such as a video,' merely 'offers *some* support for [the other side's] version of events.'"  *Sawyer*, 537 F. App'x at 291 (emphasis in original) (quoting *Witt v. W. Va. State Police*, 633 F.3d 272, 276 (4th Cir. 2011)).

Nevertheless, a video "whose accuracy is unchallenged" should be considered at summary judgment.  *Sawyer*, 537 F. App'x at 291 (quoting *Zellner v. Summerlin,* 494 F.3d 344, 371 (2d Cir. 2007)).  And where, as here, the uncontested "video footage does not clearly support" the defendants' "account," the video is viewed in the light more favorable to the plaintiff at summary judgment.  *Brooks*, 924 F.3d at 108, 115 (considering video footage in the context of an Eighth Amendment excessive force claim).

---

[6] The video was provided to the Court via an external USB drive.  It does not have a docket number.

5

In the Discussion, I shall reference expert evidence submitted by plaintiffs. Plaintiffs retained Tyrone Powers, Ph.D., a former Maryland State Trooper and former agent with the Federal Bureau of Investigation, to opine on the Officers' use of force. Dr. Powers generated a report (ECF 83-21), although the exhibit containing the report appears to be cut off before the conclusions are set forth. *See id.* at 16.[7] Plaintiffs have also submitted excerpts of Dr. Powers's deposition testimony. ECF 83-10. In addition, plaintiffs have filed portions of the deposition testimony of Charles J. Key (ECF 83-14). According to plaintiffs, Key was retained by defendants as an expert. *See, e.g.*, ECF 83 at 6. Curiously, defendants have not submitted any of Key's evidence. Nor do they acknowledge plaintiff's use of his deposition in their reply.

## B.

On the morning of December 14, 2015, Wild returned to her townhome in Middle River, located in Baltimore County, Maryland, after having spent the previous night at her mother's home. ECF 77-4 (Wild Dep.) at 4 (Tr. at 37); ECF 77-5 (Moore Dep.) at 4 (Tr. at 19). Evans was present at the home. *Id.* (Tr. at 35-36).[8] A verbal altercation ensued between Wild and Evans. *Id.* at 4-5 (Tr. at 37-39). Evans repeatedly accused Wild of being unfaithful. *Id.* To Wild, it seemed that Evans was speaking in a "kind of . . . mumble jumble," and "it was kind of like he was giving up on life." *Id.* at 5 (Tr. at 39).

---

[7] The report sets forth Dr. Powers's qualifications at ECF 83-21 at 2-5. Dr. Powers holds a doctorate in "Sociology-Justice." *Id.* at 2.

[8] It is unclear whether Evans and Wild formally resided together. *Compare* ECF 77-35 at 3 (Ms. Tserkis's answer to Officer Spahn's Interrogatory No.2, indicating that Evans lived with Wild) *with* ECF 77-4 (Wild Dep.) at 7 (Tr. at 49) ("He's never really officially lived with me."). This uncertainty is of no legal significance with respect to the Motion.

At some point during the altercation, Evans retrieved various prescription medications.  *Id.* at 5 (Tr. at 38).[9]  Wild saw Evans consume the contents of "at least three . . . massive bottles" of pills.  ECF 77-4 (Wild Dep.) at 5 (Tr. at 40).  She estimated that he swallowed "about 300 pills." *Id.* at 5 (Tr. at 40).  Wild began "begging" Evans to "throw up."  *Id.* (Tr. at 41).  Although previously agitated, Evans became "calm" and told Wild that he did not want to go to a hospital. *Id.* at 6 (Tr. at 43).  Nevertheless, fearing for Evans's safety, Wild called 911.  *Id.*[10]

In a statement dated December 16, 2015 (ECF 77-6, "Moore's Stmnt."), Moore recalled that she was dispatched to Wild's home, and arrived there at around 9:30 A.M.  *Id.* at 2.  Wild met Moore outside, and informed Moore that Evans had consumed numerous pills and "was attempting to kill himself."  *Id.*  Moore then entered the home and walked up the staircase to the second floor. ECF 77-5 (Moore Dep.) at 4 (Tr. at 19).

Moore testified that the staircase from the first floor to the second floor led to a large "open floor plan" that contained an "open-concept kitchen, living room, and dining room."  ECF 77-5 (Moore Dep.) at 4 (Tr. at 19).  This description is consistent with photos taken after the incident (ECF 83-20), as well as a "Forensic Diagram" (ECF 83-19) and a video submitted by plaintiffs, which pans across the floor.[11]  A wide "center island" separated the kitchen area from the rest of the floor, which was set up as a living room and dining room.  ECF 77-5 (Moore Dep.) at 4 (Tr. at 18); *see* ECF 83-19; ECF 83-20; *see also* video of the second floor.

---

[9] Wild did not specify the medications Evans retrieved.  But, she testified that he had "pain medicine" from a recent "spine surgery."  ECF 77-4 (Wild Dep.) at 5 (Tr. at 38).  As noted, *infra*, Evans informed one of the Officers that he consumed two different prescription pain medications as well as non-prescription pain medication.

[10] I have not been provided with a transcript or recording of the 911 call.

[11] The video was provided to the Court via an external USB drive and does not have a docket number.

Dimensions of the island have not been provided.  But, the Forensic Diagram indicates that the island was over six feet long, curved, and approximately a foot and a half in width.  *See* ECF 83-19.  One of the photos of the second floor shows that, if one were facing the kitchen area from across the island, there is a hallway to the right leading to other rooms.  *See* ECF 83-20 at 2.  The stairwell from the entrance to the home leads to this hallway.  *See* ECF 83-19.

The Forensic Diagram (ECF 83-19) is set forth below:



Officer Moore observed Evans lying on the couch "with his arm over his face."  ECF 77-6 at 2.  Moore asked Evans how many pills he had ingested.  *Id.*  He told her that he swallowed "30 Oxycodone [pills], 30 Tylenol [pills], and 30 Vicodin [pills]."  *Id.*  Moore told Evans that she and the paramedics "would have to take him to the hospital."  *Id.*  Evans refused, stating: "I'm not going anywhere."  *Id.*

In her statement, Officer Moore said that Officer Pfadenhauer arrived after the paramedics. *Id.*  However, at her deposition, Moore testified that Pfadenhauer arrived before the paramedics.

ECF 77-5 (Moore Dep.) at 4 (Tr. at 19-20).   Pfadenhauer recalled that he arrived after the

paramedics.  *See* ECF 77-8 (Pfadenhauer Dep.) at 4 (Tr. at 59-60).    In his statement, Pfadenhauer

averred that upon his arrival and entry to the second floor, he saw Moore, two paramedics, Wild,

and Evans.   ECF 77-7 (Pfadenhauer's Stmnt.) at 2; *see* ECF 77-8 (Pfadenhauer Dep.) at 4 (Tr. at

60).  And, Evans was standing in the kitchen area, leaning on the counter.  *Id.*  The counter was

directly across from the island.  *See* ECF 83-20.  Pfadenhauer was informed that Evans had

consumed many pills and required immediate medical treatment, but he refused treatment.  ECF

77-7 (Pfadenhauer's Stmnt.) at 2; *see* ECF 77-8 (Pfadenhauer Dep.) at 4 (Tr. at 60-61).

Pfadenhauer described Evans as "over six feet tall and . . . very muscular," as well as

"agitated and . . . not willing to receive help of any kind."  ECF 77-7 (Pfadenhauer's Stmnt.) at 2.

Pfadenhauer recalled that, "[f]rom [his] experience," he "knew not to physically confront [Evans]

without further backup and a taser unit."  *Id.*  He then requested a taser unit over his radio.  Notably,

neither Moore nor Pfadenhauer, nor any of the officers who subsequently came to the scene, called

for the assistance of a "mobile crisis team," which typically "consists of a . . . civilian trained in

mental health and an officer who has limited training in mental health."  ECF 77-12 (Spahn Dep.)

at 15 (Tr. at 71).

Before the arrival of Officers from the taser unit, Evans took a bottle of beer from the

refrigerator and began drinking it while leaning against the kitchen counter.   ECF 77-7

(Pfadenhauer's Stmnt.) at 2; *see* ECF 77-5 (Moore Dep.) at 3-4 (Tr. at 16-21).   Moore and

Pfadenhauer stood several feet back from the opposite side of the kitchen island.   ECF 77-6

(Moore's Stmnt.) at 2; ECF 77-7 (Pfadenhauer's Stmnt.) at 2.  Each observed Evans open a kitchen

drawer.  ECF 77-6 (Moore's Stmnt.) at 2; ECF 77-7 (Pfadenhauer's Stmnt.) at 2.  Moore saw "a

pair of scissors sticking out slightly from the drawer."   ECF 77-6 (Moore's Stmnt.) at 2.

Pfadenhauer saw "several knives" within the open drawer.  ECF 77-7 (Pfadenhauer's Stmnt.) at 2.

Notably, although Evans looked into the drawer, he did not retrieve anything.  *Id.*

Officer Canup heard the request for a taser unit over his police radio and went to Wild's

home "as an additional back-up officer," arriving about ten minutes later.  ECF 77-10 (Canup's

Stmnt.) at 2.  Canup did not specify the time at which he arrived.  But, his statement indicates that

it was sometime after Moore was "dispatched" to the scene at around 9:50 AM.  *Id.*

Canup observed Evans leaning on the kitchen counter next to an open drawer containing

"kitchen utensils and knives."  ECF 77-9 (Canup Dep.) at 3 (Tr. at 28).  According to Canup's

Stmnt., Evans "was in a very rigid posture, and would not make eye contact with anyone when

trying to speak to him."  ECF 77-10 (Canup's Stmnt.) at 3.  At Canup's request, Wild went outside,

accompanied by the paramedics.  *Id.*  Canup then unholstered his firearm and held it in what he

described as a "low-ready position."  *Id.*  He positioned himself at the intersection of the second

floor hallway and the large, open room on the second floor, allowing him to see Evans while

shielding his firearm from Evans's view.  *Id.*; *see* ECF 77-6 (Moore's Stmnt.) at 2.  Canup

attempted to engage Evans in conversation "about how his house was very nice and about his dogs

to try [to] deescalate the situation."  ECF 77-10 (Canup's Stmnt.) at 3.  But, Evans "would not

engage in conversation."  *Id.*; *see* ECF 77-6 (Moore's Stmnt.) at 2.

Around this time, and before the arrival of the taser unit, Evans retrieved and drank some

of a second beer.  ECF 77-6 (Moore's Stmnt.) at 2.  And, Canup observed Evans open a second

kitchen drawer and then place both hands on the kitchen counter near the open drawers.  ECF 77-

10 (Canup's Stmnt.) at 3.

It is not clear how much time passed before the arrival of the taser operators, Officer Spahn

and Officer Heavner.  Spahn walked up the stairs to the second floor first and "made eye contact

with [Officer] Canup who signaled . . . that they were dealing with a bad situation." ECF 77-11 (Spahn's Stmnt.) at 2; *see* ECF 77-10 (Canup's Stmnt.) at 3.

Spahn unholstered his taser and entered the large second floor room, followed by Heavner. ECF 77-11 (Spahn's Stmnt.) at 2; *see* ECF 77-10, (Canup's Stmnt.) at 3-4. According to Spahn, at that point he was not pointing the taser at Evans. Instead, he kept it "down at [his] side . . . hoping Evans would not see it." ECF 77-12 (Spahn Dep.) at 5 (Tr. at 36). But, Moore recalled that Spahn held his taser "pointed in front of him as he proceeded up the stairs." ECF 77-6 at 2.

Spahn and Heavner, the two taser operators, positioned themselves facing the middle of the kitchen island, across from Evans, who remained in the kitchen area. ECF 77-10 (Canup's Stmnt.) at 4. Pfadenhauer stood to their left and Moore moved behind them. *Id.* Canup remained to their right, positioned at the intersection of the open space and the hallway, with his gun hidden from Evans's view. *Id.*

Spahn told Evans that he needed to be taken to the hospital for treatment. ECF 77-11 (Spahn's Stmnt.) at 2; *see* ECF 77-12 (Spahn Dep.) at 5 (Tr. at 36). According to Spahn, Evans responded, "I'm not going to the fucking hospital!" ECF 77-11 (Spahn's Stmnt.) at 2; *see* ECF 77-12 (Spahn Dep.) at 5 (Tr. at 36); ECF 77-6 (Moore's Stmnt.). Spahn recalled that he (Spahn) moved closer to the island, hoping to prompt Evans to move away from the open drawers containing knives. ECF 77-11 (Spahn's Stmnt.) at 2. But, Evans did not do so. *Id.*

Without giving Evans a warning, Spahn fired his taser. *Id.*; *see* ECF 77-6 (Moore's Stmnt.) at 2; ECF 77-7 (Pfadenhauer's Stmnt.) at 2; ECF 77-10 (Canup's Stmnt.) at 4. Spahn testified that he is permitted to deploy his taser in the case of "imminent danger" to an officer or a third party. ECF 77-12 (Spahn Dep.) at 10 (Tr. at 55). In Spahn's view, Evans posed an imminent danger.

11

Spahn explained: "[H]e [could have] pick[ed] those knives up and come charging at us or me or anyone of the officers there." *Id.* at 12 (Tr. at 56).

Neither side has focused the Court's attention on any exhibits indicating the type of taser deployed or explaining how a taser works. However, Heavner testified that the "whole point of a Taser" is to "lock[] the muscular and nervous system up." ECF 77-13 (Heavner Dep.) at 8 (Tr. at 47).

The taser probes struck Evans in the chest, but apparently they did not immobilize or incapacitate him. *See* ECF 77-6 (Moore's Stmnt.) at 3; ECF 77-7 (Pfadenhauer's Stmnt.) at 2; ECF 77-10 (Canup's Stmnt.) at 3-4; ECF 77-12 (Spahn Dep.) at 12 (Tr. at 63). Evans remained standing and began to pull the probes from his body and/or to flail his arms in an attempt to break the connection between the probes and the taser. *See* ECF 77-6 (Moore's Stmnt.) at 3; ECF 77-7 (Pfadenhauer's Stmnt.) at 2; ECF 77-10 (Canup's Stmnt.) at 4; ECF 77-12 (Spahn Dep.) at 12 (Tr. at 63). Spahn recalled that Evans stepped toward the side of the island where Officer Pfadenhauer was positioned, but then stepped back towards the center of the kitchen area. *See* ECF 77-11 (Spahn's Stmnt.) at 2. As indicated, the kitchen island separated the kitchen area and the living space and, to some extent, it formed a barrier. None of the evidence indicates that Evans walked *around* the kitchen island to get to the side where the Officers were located.

At this point, Moore, Pfadenhauer, and Canup had their firearms drawn and fixed on Evans. ECF 77-6 (Moore's Stmnt.) at 3. In contrast, Evans did not have anything in his hands. ECF 77-8 (Pfadenhauer Dep.) at 7 (Tr. at 119); ECF 77-12 (Spahn Dep.) at 12 (Tr. at 63).

Spahn reloaded his taser and fired it at Evans a second time. ECF 77-11 (Spahn's Stmnt.) at 2. Still, Evans remained on his feet. *Id.* at 2. Spahn, who remained on the opposite side of the kitchen island, claimed that Evans moved toward him and resumed "flailing" his arms in an attempt

12

to sever the connection between the probes and the taser.  *Id.*  And, according to Spahn, Evans grew "increasingly aggressive and combative."  *Id.*

Pfadenhauer averred that, at around this point, he "walked around the kitchen island to attempt to get behind [Evans] to handcuff him if the taser disabled him."  ECF 77-7 (Pfadenhauer's Stmnt.) at 2.  The evidence does not indicate that Evans reacted to Pfadenhauer's movement.  And, Pfadenhauer's recollection appears to be inconsistent with the video evidence, described *infra*.[12]

Evans withdrew multiple knives from the open kitchen drawers.  *See* ECF 77-7 (Pfadenhauer's Stmnt.) at 2; ECF 77-10 (Canup's Stmnt.) at 4.  Canup described the knives as "steak knives" and testified that Evans held two knives in one hand and a third in the other hand. ECF 77-9 (Canup Dep.) at 8 (Tr. at 60).  But, according to Pfadenhauer, Evans held two knives in each hand, which he swung over his head.  ECF 77-7 (Pfadenhauer's Stmnt.) at 2.  Spahn, on the other hand, recalled Evans "flailing his arms and knives and moving aggressively throughout the kitchen area."  ECF 77-11 (Spahn's Stmnt.) at 2.  Spahn testified that Evans may have been trying to sever the wires connecting the probes to the taser.  *See* ECF 77-12 (Spahn Dep.) at 16 (Tr. at 76).  Multiple officers shouted at Evans, ordering him to drop the knives.  *Id.* at 17 (Tr. at 82); ECF 77-7 (Pfadenhauer's Stmnt.) at 2.  But, Evans did not do so.  He shouted back at the Officers, yelling "'fuck you'" and "'you'll have to shoot me.'"  *Id.*; *see* ECF 77-10 (Canup's Stmnt.) at 4.

Spahn withdrew his firearm and pointed it at Evans while keeping his taser fixed on Evans. ECF 77-11 (Spahn's Stmnt.) at 2.  Spahn ordered Heavner to fire his taser, which Heavner did.  *Id.* Again, this taser shot—the third—did not immobilize Evans.  ECF 77-13 (Heavner Dep.) at 13 (Tr. at 70).  Evans continued shouting and moving his arms about with knives in hand, perhaps in

---

[12] It seems unlikely that Pfadenhauer could have snuck behind Evans with a drawn gun, without eliciting a  reaction from Evans.

13

an attempt to sever wires connecting between the probes and Heavner's taser. *See* ECF 77-11 (Spahn's Stmnt.) at 2-3; 77-10 (Canup's Stmnt.) at 4.

Some of the evidence indicates that Evans moved toward Canup. *See* ECF 77-6 (Moore's Stmnt.) at 3; ECF 77-11 (Spahn's Stmnt.) at 3; ECF 77-13 (Heavner Dep.) at 14 (Tr. 76-77). However, other statements indicate that Evans advanced toward Pfadenhauer. *See* ECF 77-7 (Pfadenhauer's Stmnt.) at 2; ECF 77-10 (Canup's Stmnt.) at 4 (stating that Evans was "about ten feet [or] less" from Pfadenhauer).

Spahn, Pfadenhauer, and Canup fired their guns at Evans, although it is not clear who fired first. ECF 77-11 (Spahn's Stmnt.) at 3; ECF 77-7 (Pfadenhauer's Stmnt.) at 2 ("one round" fired at Evans's chest); ECF 77-10 (Canup's Stmnt.) at 4 ("three rounds" fired). Evans immediately fell to the ground. ECF 77-11 (Spahn's Stmnt.) at 3. From the top of the stairs, Canup yelled to the paramedics waiting outside, telling them to come inside. ECF 77-10 (Canup's Stmnt.) at 5. Canup then removed one knife from Evans's hand and retrieved two knives that had fallen nearby. *Id.*

Evans was pronounced dead at the scene. *Id.* The Court has not been provided with an autopsy report.

## C.

I turn to the video of the incident submitted by plaintiff.[13] It is unclear precisely when during the incident the video begins, in part because the video lacks sound. At the video's start, Evans is shown standing in the kitchen, to the right of the refrigerator, and in front of the kitchen counter. He is next to two open kitchen drawers. Curled wires run from the foreground of the

---

[13] The video displays a timestamp of December 14, 2015, at 3:19 PM. Although the date aligns with the date reflected in other evidence, the time does not. Plaintiffs have not addressed this discrepancy.

frame toward Evans, whose hands are empty.  These details suggest that the video begins after the first taser deployment.

Evans turns and faces the camera, with his back towards the refrigerator and his arms raised in what appears to be a defensive posture.  After two seconds, the camera momentarily goes black.  When Evans reappears, he takes a few short steps to his right, into the space between one end of the island and the refrigerator.  Based on the Officers' evidence, it seems that, at this point, Evans is positioned at the end of the island, across from Pfadenhauer.  *See* ECF 77-10 (Canup's Stmnt.) at 4.  Evans seems to be close to rounding the island when he stops, turns, and faces the camera, placing his right hand on the island and lifting his left hand toward his face.  He stands there for about two seconds.  He then places one hand on the island and lifts the other in front of him, with an open palm.

The narrative derived from the Officers' evidence, as set forth earlier, provides that at this point Spahn fired his taser a second time.  Discerning the taser deployment in the video is not simple, at least for the untrained eye.  But, it is undisputed that the taser was deployed around this point in the relevant sequence.  And, as Evans proceeds into the center of the kitchen area, he appears to push wires out of the path in front of him.

Evans takes a few quick steps to the open drawers and reaches into one.  The camera seems shaky for a few seconds; at the right of the frame (Evans's left), an officer comes into view, holding a raised gun pointed at Evans.  Presumably, based on the Officers' evidence, as described above, it is Canup.  Evans raises his hands from the drawers, holding at least one knife in each hand.  It is not obvious whether he is holding  more than one knife in either hand.  But, the reference to a steak knife seems an apt description.  He then lifts his right arm and extends it to his right, turning his head in that direction.  He appears to be shouting, although, again, the video lacks sound.  Evans

raises and extends his left arm and then turns his head toward the camera in the center of the frame, continuing to speak or shout.

The camera dips to the wall of the island and Evans drops from view. A red dot of light displayed on the side of the kitchen island appears in view. When the camera returns to Evans, he appears to be shouting and pointing at the officers, with his arms raised and his back to the oven and stove. He takes a few steps backwards. A string of wire appears to the left of Evans, perhaps coming from Heavner's taser deployment. It is not clear whether any of the wires are connected to or entangled with Evans's body in any way. Evans rocks on his feet, taking a few short steps forward, and then backwards. He does not advance toward the camera or in the direction of any of the Officers. But, he suddenly jerks his right elbow upwards. He then falls forward and out of view.

Additional facts are included, *infra*.

## II. Legal Standards

### A. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also, e.g.*, *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *see also, e.g.*, *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not

appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc*., 954 F.3d at 658-59 (citation omitted). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987); *see Harris v. Home Sales Co*., 499 F. App'x 285, 294 (4th Cir. 2012).

## B.  Section 1983 Generally

Several of plaintiffs' claims are founded on 42 U.S.C. § 1983.  Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was

committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).  "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'"  *Davison*, 912 F.3d at 679 (quoting *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982).  A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

The Officer Defendants do not dispute that, at the relevant time, they were acting within the scope of their employment with the BCPD, and under the color of law.

### III.  Summary Judgment Motion

### A.  Plaintiffs' Claims

Below, I address the Officers' qualified immunity defense to plaintiffs' excessive force claims, and then turn to the question of statutory standing under Maryland's wrongful death statute. But first, I shall clear away some of the underbrush created by the eleven-count Complaint.

The briefing from both sides regarding plaintiffs' excessive force claims relies entirely on federal case law applying Fourth Amendment principles.  Defendants briefly address why, in their view, plaintiffs' various State law claims fail and why the § 1983 claims fail, to the extent that they are premised on the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment.  Plaintiffs do not respond to these points.  Under the circumstances, a brief discussion is warranted to clarify the disputed issues.

In Maryland, a survival action under § 7-401(4) of the Estates and Trusts Article ("E.T.") of the Maryland Code is brought by the personal representative of a decedent's estate to recover damages for losses suffered by the victim, *i.e.*, the damages the decedent would have been able to recover if he or she had survived.  *City of Greenbelt, Md.*, DKC 11-1891, 2012 WL 115454, at *8 (D. Md. Jan. 13, 2012).  Thus, it provides "the *mechanism* by which an estate brings a claim that the decedent could have asserted had he survived."  *Id.* (emphasis in original).  Given that Counts II through XI are lodged, at least in part, by Tserkis in her representative capacity, I shall construe all of the counts as survival actions.[14]

Count XI contains a battery claim.  Defendants assert that this count "should be dismissed." ECF 77-1 at 33 n.8.  They cite *Hines v. French*, 157 Md. App. 536, 551, 852 A.2d 1047, 1055

---

[14] The distinction between a survival action and a wrongful death claim, which is invoked in Count I, is addressed, *infra*.

(2004), which stated that, under circumstances like these, "battery 'can only occur when there is no legal authority or justification for the arresting officer's actions'" (citation omitted); *see also Ashton v. Brown,* 339 Md. 70, 119–21, 660 A.2d 447 (1995).  Plaintiffs do not respond to this assertion or discuss Count XI whatsoever.  But, given defendants' theory that the battery claim necessarily rises or falls with the excessive force claim, coupled with the lack of substantive briefing on the issue by either side, I shall adopt the same approach, *i.e.*, resolve this count consistent with the excessive force claim.

To the extent that Counts VI through VIII invoke the Eighth Amendment or the right to due process under the Fourteenth Amendment, those claims fail.[15]  The Fourth Amendment, which is also invoked in those counts, "'provides an explicit textual source of constitutional protection'" with respect to an unreasonable seizure or arrest.  *Safar*, 859 F.3d at 245 (citation omitted). Therefore, "the Due Process Clause is not the proper lens through which to evaluate law enforcement's pretrial missteps."  *Id.*  In addition, Eighth Amendment protections attach only "after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."  *Ingram v. Wright,* 430 U.S. 651, 671–72 (1977).  Evans was not criminally prosecuted, and there was no "formal adjudication of guilt."  *Id.*  Therefore, the Eighth Amendment is inapplicable.

Counts III through V set forth State constitutional claims.  To the extent that they invoke due process, these claims fail for the reason discussed above.  Article 24 of the Maryland Declaration of Rights is the State constitutional counterpart to the Due Process Clause of the

---

[15] Count VII is virtually identical to Count VI in substance.  Count VII is titled "Peace Officer Liability," while Count VI is captioned "Civil Rights Claim 42 U.S.C. § 1983." "Peace Officer Liability" does not appear to have any particular legal meaning.

Fourteenth Amendment, and it is ordinarily interpreted *in pari materia* with its federal analog. *Doe v. Dep't of Pub. Safety and Corr. Servs.*, 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009); *see Littleton v. Swonger,* 502 Fed. App'x 271, 274 (4th Cir. 2012); *Dent v. Montgomery Cnty. Police Dep't*, 745 F. Supp. 2d 648, 661 (D. Md. 2010).  Accordingly, the due process claims under State law go the way of the § 1983 claims premised on due process.

Counts III through V invoke Evans's "right to be free" from unreasonable seizures.  Article 26 of the Maryland Declaration of Rights establishes such a right.  Article 26 is the State constitutional counterpart to the Fourth Amendment, and its interpretation tracks the interpretation of the Fourth Amendment.  *See Littleton*, 502 Fed. App'x at 274; *Dent*, 745 F. Supp. 2d at 661. Although Counts III through V do not explicitly invoke Article 26, they clearly claim a violation of the substantive right that Article 26 protects.  In any event, these counts are largely duplicative of the federal excessive force claim.

Count VIII asserts "Bystander Liability" under § 1983.  The Fourth Circuit has recognized a § 1983 cause of action for failure to intervene, or "bystander liability," as "'premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them.'" *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416-17 (4th Cir. 2014).  This duty "attaches when an officer observes or has reason to know that a 'constitutional violation [is being] committed' by other officers and possesses 'a realistic opportunity to intervene to prevent the harm from occurring.'" *Randall v. Prince George's Cty.*, 302 F.3d 188, 203-04 (4th Cir. 2002) (citation omitted).  Put another way, an officer who "(1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act" may be liable under this doctrine. *Id.* at 203; *see Brooks v. Johnson*, 924 F.3d 104, 110 (4th Cir. 2019).  As to the first element, the Fourth Circuit has explained that a "bystanding officer, by choosing not to intervene, functionally

participates in the unconstitutional act of his fellow officer." *Randall*, 302 F.3d at 203 n.24. But, if "the bystander lacks such specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible." *Id.*

The Officers contend, in summary fashion, that even if Evans's constitutional rights were violated, the facts do not support the claim that some of the Officers "'had a reasonable opportunity to prevent such violations'" but "'chose not to act.'" ECF 77-1 at 18 n.3 (quoting *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 419 (4th Cir. 2014)). Plaintiffs do not respond to this argument. Ordinarily, a plaintiff's failure to oppose an argument raised in a dispositive motion amounts to an abandonment of the relevant claim. *See, e.g.*, *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010). But, given the barebones nature of defendants' argument, I decline to do so here.

## B. Qualified Immunity

The Officers argue that their use of force was not unconstitutionally excessive and that, even if it was, they are nonetheless entitled to qualified immunity.

"Qualified immunity bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" *Barrett v. PAE Government Services, Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) (quoting *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 589 (2018)) (cleaned up); *see also Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021); *Campbell v. Tatarsky*, 972 F.3d 385, 392 (4th Cir. 2020); *Humbert v. Mayor and City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016); *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir.

2015); *Owens*, 767 F.3d at 395.  Thus, qualified immunity "shields police officers who commit constitutional violations from liability when, based on 'clearly established law' they 'could reasonably believe that their actions were lawful.'"  *Estate of Jones v. City of Martinsburg, West Virginia*, 961 F.3d 661, 667 (4th Cir. 2020) (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 537 (4th Cir. 2017)).

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Barrett*, 975 F.3d at 428-29; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson*, 893 F.3d at 219; *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015).  The cases are legion in support of these principles.

Notably, qualified immunity is an "'*immunity from suit* rather than a mere defense to liability . . . .'" *Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015) (citation omitted) (emphasis in original).  Accordingly, the immunity is effectively lost if defendants are erroneously subjected to a trial. *Id.*

To determine whether qualified immunity applies, the court conducts a two-step inquiry: 1) whether a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation.  *See Booker*, 855 F.3d at 538. The first prong is analyzed  "in the light most favorable to the party asserting the injury . . . ." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second prong concerns whether "'it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'"  *Merchant v. Bauer*, 677 F.3d 656, 662 (4th Cir. 2012) (citation omitted); *see Wesby*, 138 S. Ct. at 589.  The two prongs of the qualified immunity analysis "may be assessed in either sequence."  *Merchant*, 677 F.3d at 661-62;

24

accord *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 288 (4th Cir. 2021); *Estate of Jones*, 961 F.3d at 667; *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020).

"The plaintiff bears the burden of proof on the first question—*i.e.*, whether a constitutional violation occurred." *Henry v. Purnell*, 501 F.3d, 374, 377 (4th Cir. 2007). But, it is the defense's burden to prove an "entitlement to qualified immunity." *Id.* at 378. And, "[a]warding the officers summary judgment on qualified immunity grounds is only appropriate if they demonstrate 'that there is no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law.'" *Estate of Jones*, 961 F.3d at 667 (quoting Fed. R. Civ. P. 56(a); alterations in *Estate of Jones*).

I shall first address the issue as to whether the Officers' use of force violated Evans's Fourth Amendment rights. Then, I turn to the clearly established inquiry.

## 1. Excessive Force

### a.

The Fourth Amendment guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend IV. It is made applicable to the States through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

Under the Fourth Amendment, a law enforcement officer is barred from using excessive force to effect a seizure. *Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003). The "'question [is] whether the totality of the circumstances justified a particular sort of . . . seizure.'" *Buchanan*, 325 F.3d at 527-28 (alternation in original) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). In the event of a violation of the Fourth Amendment, § 1983 provides a damages remedy. *See, e.g.*, *Layne*, 526 U.S. at 609.

25

The touchstone case with respect to a claim of excessive force is *Graham v. Connor*, 490 U.S. 386 (1989).  In that case, the Supreme Court rejected the notion "that all excessive force claims brought under § 1983 are governed by a single generic standard."  *Id.* at 393. Rather, the "validity" of an excessive force claim must be "judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." *Id.* at 394.  A claim of excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen" should be evaluated "under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* at 395; *see also Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

Whether an officer's use of force was reasonable under the Fourth Amendment is "'predominantly an objective inquiry.'"  *Cybernet, LLC v. David*, 954 F.3d 162, 169 (4th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *see Purnell*, 652 F.3d at 531.  To determine the reasonableness of an officer's actions "'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Ray*, 781 F.3d at 101 (quoting *Graham*, 490 U.S. at 396).  Notably, the officer's actions are examined "'in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation.'"  *Cybernet, LLC*, 954 F.3d at 169 (quoting *Graham*, 490 U.S. at 397); *accord Pegg v. Herrnberger*, 845 F.3d 112, 120 (4th Cir. 2017).

In particular, courts look to three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396; *see E.W. by and through T.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018); *Meyers v. Baltimore Cty., Md.*, 713

F.3d 723, 733 (4th Cir. 2013).  This standard must be applied in a fact-sensitive manner and not

"'mechanically.'"  *Lombardo v. City of St. Louis, Missouri*, ___ U.S. ___, 141 S. Ct. 2239, 2241

(2021) (per curiam) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

      However, the three *Graham* factors are not "exclusive," as there could be other "objective

circumstances potentially relevant to a determination of excessive force."  *Kingsley*, 576 U.S. at

397.  For example, such other circumstances "include 'the relationship between the need for the

use of force and the amount of force used; the extent of the plaintiff 's injury; any effort made by

the officer to temper or to limit the amount of force; the severity of the security problem at issue;

the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'"

*Lombardo*, 141 S. Ct. at 224 (quoting *Kingsley*, 576 U.S. at 397)).   Moreover, the court must

consider "the proportionality of the force in light of all the circumstances.'"  *Ray*, 781 F.3d at 101

(citation omitted).

      As for lethal force in particular, an officer may shoot to kill when he or she "has 'probable

cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to

others.'"  *Betton v. Belue*, 942 F.3d 184, 191 (4th Cir. 2019) (quoting *Garner*, 471 U.S. at 11).

However, a suspect's "'mere possession'" of a weapon does not confer the "'unfettered authority

to shoot.'"  *Betton*, 942 F.3d at 191 (quoting *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013)).

Moreover, an officer is not entitled to qualified immunity if he or she shoots "a secured or

incapacitated person . . . ."  *Estate of Jones*, 961 F.3d at 668.  Notably, "an officer must make a

'reasonable assessment' that he, or another, has been '*threatened* with the weapon,' in order to

justify the use of deadly force."  *Betton*, 942 F.3d at 191 (emphasis in *Betton*) (quoting *Cooper*,

735 F.3d at 159).

A court may "separately consider non-continuous uses of force during a single incident to determine if all were constitutionally reasonable." *Streater v. Wilson*, 565 F. App'x 208, 211 (4th Cir. 2014). Here, each of the three taser deployments and the shooting of Evans may be considered non-continuous. That said, "'[a]rtificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness.'" *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) (brackets added) (quoting *Ray*, 781 F.3d at 101).

**b.**

The first and third *Graham* factors weigh in plaintiffs' favor. At a minimum, they do not cut the other way. As to the first factor, the severity of the crime, plaintiffs underscore that Evans did not commit a crime and was not suspected of having done so. ECF 85 at 22. In fact, the BCPD "Field Manual" categorizes "Threatened Suicide"—the conduct that drew the Officers to Wild's home in the first place—as a non-criminal act. ECF 83-22 at 3-4. The Officers do not genuinely contest this point.

Although defendants attempt to characterize Evans as a trespasser in Wild's home, *see* ECF 87 at 13, 16, this claim is specious. The Fourth Circuit explained in *Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016): "When the subject of a seizure 'ha[s] not committed any crime, this factor weighs heavily in [the subject's] favor.' *Bailey v. Kennedy,* 349 F.3d 731, 743–44 (4th Cir. 2003); *see also Turmon v. Jordan,* 405 F.3d 202, 207 (4th Cir. 2005) ('[T]he severity of the crime cannot be taken into account because there was no crime.')." (Alterations in *Est. of Armstrong*).

The third *Graham* factor asks whether the recipient of the alleged excessive force was resisting arrest or attempting to evade by flight. This factor either supports plaintiffs or dovetails with the analysis of the second factor. The Officers do not assert that they were attempting to

28

arrest Evans. *See Wilson*, 893 F.3d at 220 ("The third *Graham* factor . . . favors Wilson. Officer Gill had not attempted to arrest Wilson, and Wilson was not trying to evade arrest when Officer Gill repeatedly shot Wilson.") On the other hand, after Evans retrieved the knives he resisted the Officers' orders to drop them. *See Est. of Armstrong*, 810 F.3d at 901 ("Noncompliance with lawful orders justifies some use of force, but the level of justified force varies based on the risks posed by the resistance."). With that guidance in mind, it is necessary to turn to the second factor, which concerns whether Evans posed an immediate threat, to assess the "risks posed by [Evans'] resistance" and the corresponding amount of force necessary to mitigate those risks. *Id.*

Before diving into the analysis, it is important to take stock of a critical fact: Evans was emotionally disturbed at the time and, before and after the police arrived, he seemed intent on harming himself. He may also have been cognitively impaired as a result of his consumption of numerous pills of potent prescription painkillers.

At least some of the Officers were aware of Evans's emotional and mental state. And, such knowledge is relevant to the analysis of the reasonableness of the Officers' fear for their safety and to the amount of force, if any, that was justifiable under the circumstances. In *Est. of Armstrong*, 810 F.3d at 900, the Court recognized: "'The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense.'" (citation omitted).

Moreover, "because a taser deployment is such a serious use of force, a police officer ordinarily may use a taser against a suspect only in 'a situation in which a reasonable officer would perceive some immediate danger,' and not to compel compliance with police commands." *Brooks*,

924 F.3d at 118 n.5 (quoting *Estate of Armstrong*, 810 F.3d at 903).  Where "a seizure's sole justification is preventing harm to the subject of the seizure . . . . using force likely to harm the subject is manifestly *contrary* to the government's interest in initiating that seizure."  *Estate of Armstrong*, 810 F.3d at 901 (emphasis in original).

A jury could find that the Officers should have pursued alternatives to the use of a taser before the first and second taser deployments.  Moreover, according to Dr. Powers, Pfadenhauer's decision to call for taser operators, rather than the mobile crisis team, was unreasonable under the circumstances.  *See* ECF 83-10 (Powers Dep.) at 3-4 (Tr. at 40-41).  And, Key, who is supposedly defendants' expert, testified that, in general, BCPD officers are instructed "to consider whether to disengage when they are involved in a situation that could lead to the use of force."  ECF 83-14 (Key Dep.) at 2 (Tr. at 31).[16]

The Fourth Circuit addressed the importance of de-escalation in *Est. of Armstrong*, 810 F.3d at 900 (citations omitted), stating:

> "[T]he use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis." . . . And even when this ideal course is not feasible, officers who encounter an unarmed and minimally threatening individual who is "exhibit[ing] conspicuous signs that he [i]s mentally unstable" must "de-escalate the situation and adjust the application of force downward."

---

[16] Plaintiffs also assert that Key testified that BCPD prohibits the use of a taser "against a person who is only a danger to his own safety."  ECF 85 at 25-26.  But, this testimony does not appear in the excerpts of Key's deposition transcript submitted by plaintiffs.  And, as noted, defendants do not rely on Key's evidence.

Similarly, plaintiffs assert that their expert, Dr. Powers, concluded in his report that Evans did not pose a "'threat of any kind'" to the Officers at any point during the incident.  ECF 85 at 27.  However, the portion of the report submitted by plaintiffs does not contain this statement.  As mentioned, the exhibit containing Dr. Powers's report appears to be cut off at the start of the conclusion section.

Notably, the Officers do not claim that Evans verbally or physically threatened the Officers before he was tased the first two times. Nor do they state that at that point Evans was armed. Around the time of Canup's arrival, and before the first taser deployment, Evans momentarily lingered beside an open drawer containing kitchen knives. Nevertheless, Evans did not arm himself at that time. It is undisputed that Evans did not retrieve knives from the kitchen drawers until *after* he was tased for the second time.

As for Evans's demeanor, the Officers' statements and deposition testimony reflect that Evans was generally unwilling—or, perhaps, unable—to engage in conversation and unwilling to be taken to the hospital. But, there is no indication in the evidence that the Officers exhausted, or even attempted, alternatives to physical force, such as a request for the intervention of the mobile crisis team.

Pfadenhauer averred that Evans was not communicative and assumed a rigid posture. But, those facts, viewed in the light most favorable to plaintiffs, might be construed as a reflection of Evans's emotional disturbance, incapacity, and/or displeasure with the presence of the police, rather than as a threat to the Officers' safety. Significantly, once Evans migrated into the kitchen area, he remained there, separated from Moore, Pfadenhauer, Spahn, and Heavner by the kitchen island. Canup took cover, or partial cover, behind a wall, as he was positioned in a doorway where the hallway opened into the rest of the floor.

To be sure, the Fourth Circuit often considers "the size and stature of the parties involved," as well as the suspect's conduct at the time. *Dolgos*, 884 F.3d at 180-81. Pfadenhauer averred that Evans was over six feet tall and muscular. ECF 77-7 (Pfadenhauer's Stmnt.) at 2. There is little in the exhibits about the Officers' respective statures, save for Moore, a female who is smaller than the rest. Even so, Evans was outnumbered five to one, unarmed, and separated from four of

31

the Officers by the kitchen island and from Canup by a wall.  All of the Officers had a clear path to the stairwell leading to the first floor and front entrance.

Yet, Spahn deployed his taser the first time, without warning.  This was a "serious use of force."  *Est. of Armstrong*, 810 F.3d at 902 (noting that a taser "is designed to 'caus[e] . . . excruciating pain'") (alterations in original); *accord Brooks*, 924 F.3d at 112.  The video shows that, at the time of the second taser deployment, Evans was moving out of the kitchen area and attempting to walk past or around one end of the island.  But, he was not lunging, running, or gesturing provocatively.  There is no claim of even a verbal threat to the Officers.  Under these circumstances, Spahn's use of the taser was in response to Evans's resistance to being taken to the hospital, which did not clearly "raise a risk of immediate danger."  *Est. of Armstrong*, 810 F.3d at 905.  A "reasonable jury could question," and readily reject, "the need for the 'amount of force'" deployed in this situation.  *Brooks*, 924 F.3d at 112 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

*Meyers*, 713 F.3d 723, is informative.  There, a BCPD officer deployed a taser three times on a domestic violence suspect armed with a baseball bat.  *Id.* at 728-29.  The Fourth Circuit ruled that those three taser deployments constituted reasonable uses of force under the circumstances.  *See id.* at 733.  However, after the third taser deployment, the suspect dropped the baseball bat and fell to the ground, and multiple officers sat on him, immobilizing him from the waist up.  *Id.*  According to one of the officers, the suspect had ceased resisting by that point.  *Id.*  Still, one officer deployed the taser seven more times in rapid succession, until the officer "had rendered" the suspect "unconscious."  *Id.*  The Fourth Circuit rejected the defense of those seven uses of force, holding: "It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a taser on an individual who no longer is armed, has been brought

to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest." *Id.* at 734.

Unlike the troubled individual in *Meyers*, Evans was not physically restrained or immobilized by the Officers at the time of the first two tasings. However, the Officers made no attempt to restrain Evans. And, Evans was not armed, and he was physically separated from the Officers in such a way that a jury could find he did not pose a threat of harm. Further, Evans was not resisting arrest. Indeed, he had not been placed under arrest, as discussed. In this light, *Meyers* supports plaintiffs' case, at least with respect to Spahn's first two taser deployments.

The video shows that, after Spahn's second taser deployment, Evans retreated into the kitchen area, retrieved knives from the open drawers, and held them with his arms aloft and extended, pointing them out in front of him—presumably in the direction of one or more of the Officers. Evans was demonstrably agitated, although it is not possible to determine what he actually said (or shouted) to the Officers because the video lacks sound. In addition, the Officers claim that at this time Evans disregarded orders to drop the knives. This point is not disputed.

The sequence that occurred after the second tasing cannot be viewed in isolation, however. *See Ray*, 781 F.3d at 103 ("Not only did [the defendants'] violent response subject [the plaintiff] to an obvious risk of immediate injury, it also created the very real possibility that . . . the attack would continue to meet with frightened resistance, leading to an even further escalation of the violence.") The hasty resort to violence here undoubtedly escalated the tension in the room. Nevertheless, Evans's conduct with the knives in hand and his failure to comply with the Officers' commands would reasonably have caused Spahn and Heavner to fear for their safety and the safety of the others in the room. Heavner's deployment of the taser for the third time, which followed Spahn's command, was proportionate to the risk posed by Evans. *See Hogan v. Beaumont*, 779 F.

33

App'x 164, 167 (4th Cir. 2019) (tasing was justifiable where victim was armed with a gun, "failed to relinquish his gun during a thirty-minute interaction with the police," acted "erratically," ignored police instructions, and threatened the police); *Meyers*, 713 F.3d at 733 (concluding that the first three taser shocks, unlike the seven that followed, were reasonable given that the victim "was acting erratically, was holding a baseball bat that he did not relinquish until after he received the second shock, and was advancing toward the officers until the third shock caused him to fall to the ground").

However, the resort to lethal force against Evans is another matter. Very little time elapsed between Heavner's taser deployment and the use by the Officers of their firearms. They shot and killed a man who needed his help. The video shows that, during this narrow window, Evans said "fuck you," as the Officers claim. *See, e.g.*, ECF 77-10 (Canup's Stmnt.) at 4. Though vulgar, that turn of phrase does not ordinarily constitute a threat to safety, let alone one that justifies the use of lethal force. Further, the video is not consistent with the Officers' assertions that, at the time Evans was shot, he was advancing toward one of the Officers.[17]

Instead, the video shows that Evans was essentially stationary at the time that he fell to the ground as a result of the shooting. Similarly, Dr. Powers described the pertinent takeaway from the video, ECF 83-21 at 11:

> According to a thorough review of video material produced in this case, Jeffrey Evans never crossed to the other side of the large kitchen island where the police officers were situated, and more importantly, there is no indication that Jeffrey Evans began to make or made any sudden movement or advance towards Officers Canup, Pfadenhaur, Moore, Spahn, Heavner or any other person before being fatally shot.

As noted, defendants do not offer any direct rebuttal to this opinion.

---

[17] As noted, defendants' assertions about Evans's conduct at the time he was shot are contradictory. Three of the Officers averred that Evans advanced toward Canup, while two other Officers asserted that Evans moved toward Pfadenhauer.

In sum, the video, coupled with the opinions of Dr. Powers and Key, and viewed against the backdrop of the Officers' evidence, could support a finding that at the time of the shooting, Evans "did not threaten" the Officers or "move suddenly or act in a threatening manner" towards them.  *See Wilson*, 893 F.3d at 220 (concluding that fatal shooting was unreasonable where victim held a "small knife," did not threaten anyone, and "'stumbled'" forward toward the police, from whom he was separated by a distance of eight to twenty feet, even though the victim did not drop the knife when ordered to do so).

*Estate of Jones*, 961 F.3d 661, bolsters this conclusion.  There, five police officers surrounded a homeless man, Jones, who was held in a chokehold on the ground by one of the officers as he was tased, kicked, and held by the others.  *See id.* at 665.  During the tussle, it became apparent that Jones held a small knife in one hand, although according to the Fourth Circuit, he was physically unable "to wield [the knife] given his position on the ground."  *Id.* at 669.  The officers retreated and, "[s]econds later," multiple officers collectively fired twenty-two rounds at Jones, who remained lying on the ground.  *Id.*  The Fourth Circuit ruled the officers' use of their weapons to be objectively unreasonable in part because Jones "had been secured . . . immediately before he was released and shot" mere seconds later.  *Id.* at 668.

Unlike in *Estate of Jones*, Evans was not "pinned to the ground by five officers."  But, like *Estate of Jones*, a jury could find that Evans was not in a position to wield the knives against the Officers, given the barriers between them and the fact that he was not advancing at the time he was shot.  Moreover, the broader proposition set forth in *Estate of Jones* is pertinent here: "Non-cooperation with law enforcement has never given officers carte blanche to use deadly force against a suspect; luckily for many of us, neither has being 'armed' with a small knife."  *Id.* at 670-71.

35

Therefore, at a minimum, the existence of the video footage, when taken alongside the expert evidence and the Officers' eyewitness accounts, presents triable issues for the jury as to the reasonableness of the first two taser deployments as well as the shooting. *Cf. Brooks*, 961 F.3d at 108-09 (viewing video footage in the light most favorable to the § 1983 plaintiff in denying defendants' motion for summary judgment).

c.

As mentioned, defendants contend that plaintiffs' common law battery claim in Count XI fails because the use of force against Evans was legally justifiable. For the reasons set forth above, this argument is unavailing with respect to the first two taser deployments and the shooting.

With respect to the § 1983 bystander liability claim in Count VIII, the facts preclude summary judgment for defendants. Contrary to the Officers' unsubstantiated assertion, the evidence plainly presents genuine issues of material fact as to whether the Officers who did not use a taser nonetheless failed to intervene, despite having had a reasonable opportunity to do so. The same is true of the shooting. Relatedly, defendants do not address the bystander liability claim in their discussion of the inquiry concerning clearly established law. Accordingly, I decline to do so in the following section.

2. Clearly Established

a.

Assuming that Evans's Fourth Amendment right to be free from an unreasonable seizure was violated, the Court must next "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct." *Wilson*, 893 F.3d at 219. This is a question of law for the court to resolve. *Ray*, 948 F.3d at 228; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). The second inquiry "turns on the 'objective legal reasonableness'" of the Officers' conduct.

36

*Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

To determine whether the right was clearly established, the court first must define the right at issue. *Scinto,* 841 F.3d at 235. Next, the clearly established inquiry requires an analysis as to the contours of the right, to determine if it was "sufficiently clear [such] that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Creighton*, 483 U.S. at 640). An officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted).

In other words, the doctrine "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 573 U.S. 228, 243 (2014) (citation omitted); *accord Robertson*, 989 F.3d at 288 (qualified immunity offers protection for actions that are not clearly forbidden in light of "murky" law) (citation omitted); *Brawn v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (qualified immunity is a defense to liability for "'bad guesses in gray areas'") (citation omitted); *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (the standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law'") (citation omitted). Mistaken judgments include mistakes of law, mistakes of fact, and mistakes based on mixed questions of law and fact. *Pearson*, 555 U.S. at 231.

Notably, "a right may be clearly established by any number of sources, including a . . . case, a statute, or the Constitution itself." *Owens,* 767 F.3d at 399. With respect to case law,

courts in the Fourth Circuit look to decisions of the Supreme Court, the Fourth Circuit, or the highest court of the state where the conduct occurred. *Wilson*, 893 F.3d at 221 (citation omitted). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll*, 574 U.S. at 16-17 (quoting *al-Kidd*, 563 U.S. at 741); *see Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1152 (2018).

However, a "right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Wilson*, 893 F.3d at 221; *see Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) ("[A] 'general constitutional rule . . . may apply with obvious clarity . . . even though the very action in question has not previously been held unlawful.'") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Indeed, the Supreme Court has never required a "'case directly on point for a right to be clearly established.'" *Kisela*, 138 S. Ct. at 1152 (citation omitted); *see al-Kidd*, 563 U.S. at 741. Thus, "even without 'directly on-point, binding authority,' qualified immunity is inappropriate if 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" *Ray*, 948 F.3d at 229-30 (citation omitted).

On the other hand, "courts are 'not to define clearly established law at a high level of generality.'" *Wilson*, 893 F.3d at 221 (quoting *Kisela*, 138 S. Ct. at 1152). The inquiry focuses on "the specific context of the case," not "a broad general proposition." *Adams v. Ferguson*, 884 F.3d 219, 227 (4th Cir. 2018) (citation omitted).

### b.

First, the Officers argue that even if the tasing violated Evans's Fourth Amendment rights, those rights were not clearly established at the time. ECF 77-1 at 33. Defendants do not distinguish between the first and second taser deployments, on the one hand, and the third deployment on the

38

other.  They rely on *Est. of Armstrong*, 810 F.3d 892, which was decided about one month after the events here, and which held that the "right not to be tased while offering stationary and non-violent resistance to a lawful seizure was not clearly established . . . ."  *Id.* at 909.  The Fourth Circuit announced that "law enforcement officers should now be on notice that such taser use violates the Fourth Amendment."  *Id.* at 910.

However, at the time of the first two taser deployments here, Evans was not resisting arrest or disregarding any police instructions.  The definition of the right at issue in *Est. of Armstrong* is too narrow to fit the relevant circumstances here.  Rather, Spahn's use of force (though not Heavner's) comes closer in line with the facts of *Yates*, 817 F.3d 877, decided in 2016.

In *Yates*, two officers conducted a traffic stop of Yates, the plaintiff.  *Id.* at 881.  After both vehicles came to a stop, one officer, Terry, exited his vehicle and "forced Yates out of" his car. *Id.*  Yates placed his hands on the car, as ordered, and then "inquire[d] as to the basis for the arrest." *Id.*  He did not receive an explanation.  "With Yates' hands on top of the car and Terry behind him, Yates turned his head to the left," which prompted Terry to deploy his taser.  *Id.*  Yates fell to the ground; Terry tased him two more times.  *Id.*

The Fourth Circuit ruled that the *Graham* factors weighed "heavily in Yates' favor."  *Id.* at 885.  As to the second prong of the qualified immunity analysis, and of import here, the Court held that "it was clearly established in 2008 that a police officer was not entitled to use unnecessary, gratuitous, or disproportionate force by repeatedly tasing a nonviolent misdemeanant who presented no threat to the safety of the officer or the public and who was compliant and not actively resisting arrest or fleeing."  *Id.* at 887.  That ruling controls here, at least as to the first two taser deployments.

Of relevance, the *Yates* Court relied, in part, on *Meyers*, 713 F.3d 723.  *See Yates*, 817 F.3d at 887.  *Meyers* was decided in 2013.  There, the Court held that it is unreasonable for an officer to repeatedly tase an unarmed, physically restrained person who was not actively resisting arrest. *Meyers*, 713 F.3d at 734.  In addition, the Court denied the defendants' claim of qualified immunity, observing that Fourth Circuit precedent had already established that "'officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity.'"  *Id.* (quoting *Bailey v. Kennedy,* 349 F.3d 731, 744–45 (4th Cir.2003)).  *Meyers* provided ample notice of a clearly established right as to tasing in certain circumstances, including those present here.

With respect to the Officers' use of their firearms, the Officers rely principally on *Wilson*, 893 F.3d 213, which was decided in 2018.  There, Wilson, the plaintiff, showed up at his ex-girlfriend's residence, "kicked down" the front door, and proceeded to assault his ex-girlfriend. *Id.* at 216; *see id.* at 217.  Wilson then left.  *Id.* at 217.  In the interim, the ex-girlfriend called 911 to report Wilson's actions.  *Id.*  A police officer, Officer Gill, was dispatched to her residence.  *Id.* Thereafter, as Gill stood outside, he saw Wilson approaching and attempted to engage Wilson in conversation.  *Id.*  Wilson pulled a shiny object out of his pocket, which Gill was unable to identify, and which was later identified as a pocketknife.  *Id.*  Gill withdrew his firearm and ordered Wilson to drop the object; Wilson did not comply.  *Id.*  Instead, he "began directing obscene remarks at Johnson . . . took some steps forward, started 'poking' himself with the knife, and 'slit his throat.'" After taking "a few more steps" forward, Wilson "began 'stab[bing]' and 'poking' himself in the chest," causing him to "'stumble[ ]'" forward.  *Id.* (alterations in original).  The distance between Wilson and Gill at that point was disputed; the parties' estimates ranged from ten to twenty feet. *Id.*  Gill fired his weapon five times, "aiming for the center of Wilson's body."  *Id.*  "The record

[did] not indicate whether Officer Gill issued a further warning to Wilson before shooting him." *Id.* at 217-18.

The Fourth Circuit concluded that the facts, taken in the light most favorable to Wilson, could have supported a jury finding that "Officer Gill violated Wilson's Fourth Amendment right to be free from excessive force." *Id.* at 221. But, the Court ruled that Gill was nevertheless shielded by qualified immunity.

The *Wilson* Court considered whether it was clearly established in October 2012 that a shooting constituted unconstitutionally excessive force when, *id.* at 222:

> (1) the officer had probable cause to believe that the person had committed certain misdemeanors, one of which involved the use of force against another person; (2) the individual was standing about 20 feet from the officer holding a knife and using it to hurt himself, but was not threatening anyone or making any sudden movements; and (3) the individual had ignored the officer's repeated commands to drop the knife.

Wilson's right to be free from excessive force under those circumstances was not clearly established at the relevant time. Although "'mere possession' of a deadly weapon by the individual did not justify the use of deadly force," as established in *Cooper*, 735 F.3d at 154, 159-60, "Wilson was not shot solely because he had a deadly weapon in his possession." *Wilson*, 893 F.3d at 222. Wilson was also "suspected of committing two crimes," and ignored "repeated commands to drop the knife." *Id.* On that basis, the Court distinguished *Clem v. Corbeau*, 284 F.3d 543 (4th Cir. 2002), in which police officers were denied qualified immunity for the shooting of an unarmed man "suffering from dementia." *See id.*

*Clem* is pertinent here. In that case, two police officers, Corbeau and Nelson, were dispatched to the home of Clem and his wife following her 911 call concerning Clem's condition. *Clem*, 284 F.3d at 546. "It was apparent to both officers that Mr. Clem was mentally ill and . . . 'out of it,'" but nevertheless calm. At the request of Clem's wife, the officers attempted to

persuade Clem to see a doctor.  *Id.*  Thereafter, he "became agitated" and began to act erratically. *Id.* at 547.  Each officer subsequently fired pepper spray at Clem, several minutes apart.  *See id.* Thereafter, Clem began "'stomping'" in the direction of Corbeau "in a 'very odd' manner like a 'robot,' with his hands open and waving in front of him, movements consistent with his recent subjection to pepper spray." *Id.* at 548.  Without warning, Corbeau withdrew his gun and fired it at Clem.  *Id.*  These facts led the *Clem* Court to conclude that "Corbeau shot a mentally disabled, confused older man, obviously unarmed, who was stumbling toward the bathroom in his own house with pepper spray in his eyes, unable to threaten anyone."  *Id.* at 552.

Unlike the victim in *Wilson*, Evans was not suspected of committing any crimes and did not have an unimpeded path toward any of the officers, from whom he was separated by a kitchen island and, in the case of Canup, a wall.  And, unlike Mr. Clem, Evans was armed with steak knives at the time of his shooting.  Like both Wilson and Clem, Evans was, arguably, emotionally and mentally disturbed at the relevant time.  However, this case has one other important shared feature with *Clem*: the police used sub-lethal force multiple times before turning to their firearms.  As noted, the case law counsels that the last act—the shooting—should not be viewed in isolation. *See Ray*, 781 F.3d at 103. And, a jury could conclude that Evans's conduct at the time of the shooting—holding up the knives (perhaps steak knives)—was a direct result of, or reaction to, the prior uses of force against him.

Plaintiffs also draw on *Connor v. Thompson*, 647 F. App'x 231 (4th Cir. 2016) (per curiam), which addressed the fatal shooting of a suicidal man in his home. The police were called to the residence of the victim, Carter, by his relatives, who "found him drunk and suicidal." *Id.* at 233.  The officers succeeded in getting Carter to agree to leave the residence and receive medical treatment. *Id.* at 234.  When Carter was "halfway down the four stairs," and as the officers stood

at the bottom of a four-step stairwell leading to the ground-floor exit, Officer Thompson noticed that Carter was holding a paring knife. *Id.* Thompson drew his gun; both officers ordered Carter to drop the knife, but he did comply. After Carter descended the remaining two steps, Thompson shot him. *Id.*

With respect to the clearly established analysis, the *Connor* Court drew on circuit precedent "concerning the use of force against an armed, but nonthreatening individual." *Id.* at 239. The Court explained, *id.* (alterations in original):

> Most specifically, we held that officers who acted in 2007 were not entitled to qualified immunity after deploying deadly force against an individual who "stood at the threshold of his home, holding [a] shotgun in one hand," but otherwise doing nothing "to support the proposition that a reasonable officer would have had probable cause to feel threatened." *Cooper,* 735 F.3d at 159; *see id.* at 160. . . . Thompson, acting in 2012, had no less notice that deadly force was clearly unlawful when he fired as Carter descended two steps inside his home, refused to drop a paring knife, but otherwise did nothing to support the conclusion that he posed an immediate threat to anyone's safety.

*See also Betton*, 942 F.3d at 191 (observing that although the victim in *Cooper* "held a firearm, he had not made any sudden moves or threats").

Like Carter, Evans engaged in suicidal conduct before the Officers' arrival and was holding relatively small kitchen knives at the time of his shooting. Although Evans displayed more animosity toward the Officers in the moments preceding his death than Carter did—in particular, saying or shouting "fuck you"—a jury could find that Evans did not physically threaten the Officers. For example, when the Officers fired their weapons, Evans was not moving toward the Officers. And, he was physically separated from the Officers and more distant from them than Carter was from the officer who shot him.

*Connor*, like other cases discussed, *supra*, relied on *Cooper*, 735 F.3d 145. *Cooper* was decided in 2013 and concerned events that took place in 2007. There, officers approached the

victim's doorstep late at night, in response to calls from neighbors regarding a domestic disturbance. *Id.* at 155. One officer tapped on the window of the victim's home, but did not announce his presence or identify himself as law enforcement. *Id.* The victim retrieved a shotgun and stepped out onto his porch, under darkness, "holding the shotgun in one hand, with its muzzle pointed at the ground." *Id.* at 159; *see id.* at 155. He made no threats or "sudden moves," and "ignored no commands." *Id.* at 159. But, the officers immediately opened fire. *Id.* at 155.

In short, the Court held that the officers lacked a reasonable basis to feel threatened, and, thus, that the shooting constituted an unlawful use of force. *See id.* at 158-60. The Fourth Circuit also denied the defendants' claim of qualified immunity. *See id.*; *see Wilson*, 893 F.3d at 222 (stating that *Cooper* teaches that, as of 2007, it was clearly established that the "'mere possession' of a deadly weapon . . . did not justify the use of deadly force"). *Cooper*, 735 F.3d 145, as interpreted and applied by *Connor*, coupled with *Clem*, discussed, *infra*, gave the Officers sufficient notice that a jury could find that the use of lethal force against Evans was unconstitutional under the circumstances of this case.

As mentioned, a court need not rely on a single "'case directly on point for a right to be clearly established.'" *Kisela*, 138 S. Ct. at 1152 (citation omitted); *see al-Kidd*, 563 U.S. at 741. Therefore, I conclude that the Officers are not entitled to qualified immunity, to the extent that plaintiffs' Fourth Amendment claims are based on the first two taser deployments and the use of lethal force.

## C. Statutory Standing

According to defendants, Ms. Tserkis, in her *representative* capacity, is the only proper plaintiff in the suit. *See* ECF 77-1 at 15-18. Defendants contend that Ms. Tserkis, in her *individual* capacity, along with the other plaintiffs—the decedent's two other sisters and his granddaughter—

44

are improper plaintiffs because they lack standing under Maryland's wrongful death statute. *Id.* at 15.

As noted, Count I asserts a claim under Maryland's wrongful death statute, C.J. § 3-904(a). This statute "'allows the decedent's beneficiaries or relatives to recover damages for loss of support or other benefits that would have been provided, had the decedent not died as a result of another's negligence'" *Choudhry v. Fowlkes*, 243 Md. App. 75, 85, 219 A.3d 107, 112 (2019) (quoting *Spangler v. McQuitty*, 449 Md. 33, 53, 141 A.3d 156, 168 (2016)), *aff'd*, 472 Md. 688, 248 A.3d 298 (2021). The Maryland Court of Appeals has explained: "The primary beneficiaries of a wrongful death action are the spouse, parent, and child of the decedent. [C.J.] § 3–904(a)(1). However, relatives by blood or marriage who *substantially relied upon the decedent*, are also eligible claimants. [C.J.]  § 3–904(b)." *Spangler*, 449 Md. at 48, 141 A.3d at 165 (emphasis added); *see Carter v. Wallace & Gale Asbestos Settlement Trust*, 439 Md. 333, 362, 96 A.3d 147, 164 (2014) (explaining that a claim under the Maryland wrongful death statute "is brought on behalf of the surviving heirs *or beneficiaries* . . . .") (emphasis added).

Notably, the Maryland wrongful death statute does not encompass the survivorship claims of a decedent. In Maryland, two separate statutes are relevant to such claims. C.J. § 6-401 is titled "Survival of actions." It states that "a cause of action at law, whether real, personal, or mixed, survives the death of either party," with the exception of a cause of action for slander. *Id.* § 6-401(a), (b). And, Md. Code (2017 Repl. Vol., 2020 Supp.), § 7-401(y) of the Estates and Trusts Article ("E.T.") is also pertinent. It recognizes the survival of claims "pursued by the personal representative of the decedent's estate for claims that the decedent could have prosecuted 'against a tort-feasor for a wrong which resulted' in his death." *Dowling v. A.R.T. Inst. of Washington, Inc.*, 372 F. Supp. 3d 274, 289 (D. Md. 2019) (quoting E.T. § 7-401(y)(1)(ii)).

In a survival action initiated pursuant to C.J. § 6-401 and E.T. § 7-401(y), "the cause of action arises from the injuries sustained by the victim and is commenced by the personal representative of the deceased, seeking damages for the injuries suffered by the victim and prosecuted as if the victim were still alive." *Jones v. Prince George's Cty., Md.*, 541 F. Supp. 2d 761, 764 (D. Md. 2008), *aff'd*, 355 F. App'x 724 (4th Cir. 2009). The claims asserted by Tserkis, in her representative capacity, fit this bill. "In contrast, a wrongful death action is brought by the relatives of the decedent, seeking recovery for their [own] loss as a result of the victim's death." *Id.* (brackets added); *see Starr v. United States*, 262 F. Supp. 2d 605, 607 n.1 (D. Md. 2003) (comparing survival actions and wrongful death claims); *see also Dowling*, 372 F. Supp. 3d at 289 (same). Such are the claims of the individual plaintiffs here.

Given that the individual plaintiffs are not the spouse, parent, or child of the decedent, they have standing under the wrongful death statute only if, prior to Evans's death, they were substantially dependent on him. *See, e.g.*, *Spangler*, 449 Md. at 48, 141 A.3d at 165. The Maryland Court of Special Appeals dealt with the substantial dependence standard in *Ditto v. Stoneberger*, 145 Md. App. 469, 805 A.2d 1148 (2002).

There, the sister and niece of the decedent sought to file suit under C.J. § 3-904. The *Ditto* Court observed that prior to 1997, the statute required a "secondary beneficiary"—i.e., anyone other than a parent, spouse, or child—"to be 'wholly' dependent on the deceased to recover wrongful death benefits." *Ditto*, 145 Md. App. at 482, 805 A.2d at 1155 (quoting former version of statute). But, in 1997 the Legislature amended the law, replacing "wholly" with "substantially." *Id.* One source of guidance to which the court looked in construing "substantially" was the 1990 edition of Black's Law Dictionary, which defined the term as: "'Of real worth and importance; of considerable value; valuable. . . .'" *Id.* at 490, 805 A.2d at 1160.

Turning to the facts, the court noted that the plaintiffs lived with the decedent, pooled their income, and shared living expenses. *Id.* The decedent contributed "36% of the total 'family' earnings," *id.*, which exceeded his "proportionate share of the fixed expenses." *Id.* at 491, 805 A.2d at 1161. These facts were sufficient to enable a jury to find that the plaintiffs' dependence on the decedent was substantial, in that the decedent provided them with something "of real worth and considerable value." *Id.* at 491, 805 A.2d at 1160; *see Choudhry*, 243 Md. App. at 96, 219 A.3d at 119 (stating that *Ditto* construed "'substantial' in [C.J.] § 3-904(b) to mean contributions by the decedent of 'real worth and considerable value').

Plaintiffs effectively concede that neither Tserkis, in her individual capacity, nor Ms. Jernigan were substantially dependent on the Decedent. *See* ECF 85 at 13. But, according to plaintiffs, the evidence concerning the respective relationships of Ms. Williams and K.E. with Evans presents issues of material fact. *Id.* With respect to Williams, plaintiffs point out that from 2000 until Evans relocated to Maryland, at an unspecified time, he lived at a North Carolina residence owned by Williams and paid her $750 in rent per month, in addition to paying Williams's property taxes and performing general upkeep. *Id.*; *see* ECF 83-1 (Williams's answers to Spahn's interrogatories) at 2-3. That totals $9,000 per year in rent, plus the value of property taxes and maintenance work. Moreover, Williams's pertinent interrogatory answer states: "Evans would have continued to pay such expenses for the remainder of his life." *Id.* at 3.

Defendants do not question whether Evans would, in fact, have continued providing his sister with such payment for the rest of his life, had he not been killed. Rather, they contend that because Williams's North Carolina property was not her primary residence, the monies she received from Evans in connection with that property "cannot constitute substantial dependence." ECF 77-1 at 17. Although the Officers do not offer any support for this argument, it aligns with

common sense.  Had Evans ceased paying rent to his sister, if he had not already ceased doing so after relocating to Baltimore, Williams could most likely have found a different tenant to replace him.  At least, nothing in the record suggests that Williams would have been unable to do so. Perhaps a new tenant would also have been willing to cover Williams's property taxes and/or to perform upkeep.  In sum, the evidence reflects that Williams financially benefited from her arrangement with her brother.  But, it does not indicate that Williams substantially *depended* on him.

As for K.E., she was Evans's only grandchild.  *See* ECF 83-2 (answers of Ms. Cooper Spaulding, K.E.'s mother, to Spahn's interrogatories).  Plaintiffs have submitted evidence attesting to the close relationship between Evans and K.E, as well as the material support that Evans provided K.E. and K.E.'s mother, Ms. Cooper Spaulding.  But, plaintiffs do not cite any legal authority suggesting that the substantial dependence standard encompasses emotional or relational support.  In *Ditto*, the court's explication of substantial dependence focused solely on material support.  Accordingly, I shall consider only the ways in which Evans provided for K.E. financially, although K.E. undoubtedly suffered in other ways from the loss of her grandfather.

According to a statement by Cooper Spaulding (ECF 83-3), which appears to have been appended to her answers to Spahn's interrogatories, Cooper Spaulding and Evans's son, Steven Evans ("Steven"), had K.E. when they were young—Steven was nineteen years of age.  ECF 83-3 at 1.  Cooper Spaulding describes herself as a "single mother" and notes that Steven, who was "simply inconsistent" as a parent, died "not long before" Evans.  *Id.*  Over the years, Evans helped Cooper Spaulding support K.E. in various ways, *id.*:

> [Evans] gave me a job with his plumbing company . . . and made sure I had flexible hours with pay so that I could be there for [K.E.], and if by chance I couldnt [sic] then he always made sure he was available.  He even helped me to put a down payment on my first apartment.

48

Various answers to defendants' interrogatories round out a picture of Evans as a provider for K.E., although these submissions are light on detail. Cooper Spaulding stated that Evans provided K.E. with "school clothing, food, monetary gifts, birthday and Christmas gifts, and other financial support." ECF 83-2 at 3. Similarly, in Tserkis' answer to Spahn's interrogatories, she asserted that Evans "provided for [K.E.] financially" and bought her "school clothes" and gifts. ECF 77-35 at 7. In addition, Evans "would pick [K.E.] up from daycare every day, and take care of her while her parents were working." *Id.*

The Officers assert that although Evans's tax returns for the years 2011 through 2013 reflect reported income of approximately $20,000 each year, Tserkis "estimate[ed]" Evans's income at around $100,000 per year. ECF 87 at 7. But, the Officers have not submitted exhibits that explain or substantiate either of these figures. In addition, neither side addresses seemingly relevant facts adduced in Cooper Spaulding's interrogatory answers.

In particular, since June 2015 K.E. has received Social Security payments of $838 per month as her father's beneficiary, which will terminate when K.E. turns eighteen;[18] K.E. received approximately $37,000 from Evans's life insurance policy; and, Cooper Spaulding is married. *See* ECF 83-2 at 2-3. These details amplify the haziness in the record concerning the various types of material support that K.E. and Cooper Spaulding received from Evans, including childcare responsibilities. In short, the patchwork picture produced by the evidence gives rise to triable issues that preclude summary judgment as to K.E.

Therefore, I shall grant the Officers summary judgment as to Stutzman, Williams, and Tserkis, in her individual capacity only, but not as to K.E.

---

[18] K.E.'s age is not clear.

49

## IV.  Bifurcation Motion

I turn to the Officers' request to bifurcate trial as to liability and damages, respectively, pursuant to Fed. R. Civ. P. 42(b).  That rule, titled "Separate Trials," states, in relevant part: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."  The trial court "has broad discretion" in this area.  *Dawson v. Prince George's Cty.*, 896 F. Supp. 537, 539 (D. Md. 1995).  Several courts "have indicated" that the separation of trial on liability and damages, respectively, "should be used sparingly."  Wright & Miller, Fed. Prac. & Proc. Civ. § 2390 (3d ed. 2021 update); *see, e.g.*, *Doe No. 1 v. Knights of Columbus*, 930 F. Supp. 2d 337, 378–79 (D. Conn. 2013) ("'bifurcation is the exception and 'not the rule'") (citation omitted); *Laitram Corp. v. Hewlett-Packard Co.*, 791 F. Supp. 113, 114 (E.D. La. 1992) (same); *see also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) ("Rule 42(b) merely *allows,* but does not require, a trial court to bifurcate cases 'in furtherance of convenience or to avoid prejudice.'") (citation omitted; emphasis in *Hangarter*).  That said, "a trial must remain fair to both parties, and . . . considerations of convenience may not prevail where the inevitable consequence to another party is harmful and serious prejudice."  *Dixon v. CSX Transp., Inc.*, 990 F.2d 1440, 1445 (4th Cir. 1993).

The defense hammers on the assertion that the individual plaintiffs cannot provide relevant testimony concerning the Officers' use of force on Evans.  *See* ECF 74-2 at 3-4; ECF 82 at 2-5. This is wholly besides the point.  Plaintiffs do not indicate that they plan to rely on such evidence to prove excessive force.  The Officers' true concern is that, without bifurcation, plaintiffs' testimony regarding their loss of Evans, to the extent that such testimony is relevant to damages, will prejudice the Officers with regard to liability.  However, the principal case on which the

Officers rely, *Dixon*, 990 F.2d 1440, did not concern bifurcation of liability from damages. Rather, the movants there sought to bifurcate trial on a federal statutory claim and various state law claims, including a loss of consortium claim brought by the injured party's spouse. *Id.* at 1443-44. Here, in contrast, there is no loss of consortium claim. And, should evidence regarding damages veer too far from the sober facts of Evans's financial ties with K.E., and into more potentially prejudicial territory, the Court can provide curative jury instructions. *See R.E. Linder Steel Erection Co. v. Wedemeyer, Cernik, Corrubia, Inc.*, 585 F. Supp. 1530, 1534 (D. Md. 1984).

In addition, bifurcation will more likely than not be a drain on judicial efficiency. In general, separating proceedings on liability and damages "in personal injury cases may save time." Wright & Miller, § 2390, *supra*. However, any consideration of time savings must account for the status of the case as a whole. As noted, the Court has already bifurcated the trial as to the *Monell* claim. Granting the Bifurcation Motion could result in three separate trials—or four, should the BCPD also seek to bifurcate damages from liability in the trial on the *Monell* claim. Given the significant backlog of trials in this District caused by the COVID-19 pandemic, splitting one trial into two would further burden the Court.

Therefore, I shall deny the Bifurcation Motion.

### V.  Conclusion

For the foregoing reasons, I shall grant in part and deny in part the summary judgment motion. And, I shall deny the Bifurcation Motion.

An Order follows.

Date: July 23, 2021                    _____/s/_____
                                       Ellen L. Hollander
                                       United States District Judge

51